# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF ILLINOIS

DALLAS MCINTOSH, #B85114
    Plaintiff,

-v-

JEFFREY MILLER; C/O TOMSHACK; SGT. MONROE; LT. WEBB; C/O IRWIN; C/O CROUSE; SGT. KELLER; CHERYL BOLLING; DANA NEWTON; SHAYNE MERCIER; AMY BURLE; LT. FRANK; SCOTT THOMPSON; and ROB JEFFREYS, individually and in their official capacities,
    Defendants.

Case No. 21-862 COMPLAINT

CIVIL RIGHTS COMPLAINT
[42 U.S.C. § 1983]

Jury Trial Demanded

## I. JURISDICTION & VENUE

1. This is a civil action authorized by 42 U.S.C. Section 1983 to redress the deprivation, under color of state law, of rights secured by the Constitution of the United States. The court has jurisdiction under 28 U.S.C. Section 1331 and 1343(a)(3). Plaintiff seeks declaratory relief pursuant to 28 U.S.C. Section 2201 and 2202. The court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. Section 1367.

2. The Southern District of Illinois is an appropriate venue under 28 U.S.C. Section 1391(b)(2) because it is where the events giving rise to this claim occurred.

## II. PLAINTIFF

3. Plaintiff, Dallas McIntosh, is and was at all times mentioned herein a prisoner of the State of Illinois, being held in the custody of the Illinois Department of Corrections. He is currently confined in Lawrence Correctional Center, located at: 10930 Lawrence Road, Sumner, IL 62466.

## III. DEFENDANTS

4. Defendant, Jeffrey Miller (a.k.a., Supply Supervisor ("S/S") Miller), was at all times mentioned herein a Commissary Officer of Pinckneyville Correctional Center ("PNKCC"), located at: 5835 State Route 154, Pinckneyville, IL 62274. As such, Miller served as a Supply Supervisor who was responsible for processing commissary orders and purchases made by the inmates of PNKCC. Upon information and belief, Defendant Miller first began working in the aforementioned position and/or capacity in or about the beginning of 2018 and continued working as such throughout all of 2019 and possibly beyond.

5. Defendant, C/O Tomshack (i.e., Correctional Officer Tomshack), was at all times mentioned herein a Correctional Officer ("C/O") of PNKCC whose first name is presently unknown to Plaintiff. He is sued in his individual capacity.

6. Defendant, Sgt. Monroe (i.e., Sergeant Monroe), was at all times mentioned herein a C/O of PNKCC who held the rank of Sergeant, whose last name is Monroe, and whose first name is presently unknown to Plaintiff. As such, she was responsible for assisting, in a supervisory manner, with the day-to-day oversight and operation of the Residential #1 ("R1") housing unit/cellhouse. She is sued in her individual capacity.

7. Defendant, Lt. Webb (i.e., Lieutenant Webb), was at all times mentioned herein a

C/O of PNKCC who held the rank of Lieutenant, whose last name is Webb, and whose first name is presently unknown to Plaintiff. As such, he was in charge of the entire R1 cellhouse at the prison. He is sued in his individual capacity.

8. Defendant, C/O Irwin (i.e., Correctional Officer Irwin), was at all times mentioned herein a C/O of PNKCC whose first name is presently unknown to Plaintiff. He is sued in his individual capacity.

9. Defendant, C/O Crouse (i.e., Correctional Officer Crouse), was at all times mentioned herein a C/O of PNKCC whose first name is presently unknown to Plaintiff. He is sued in his individual capacity.

10. Defendant, Sgt. Keller (i.e., Sergeant Keller), was at all times mentioned herein a C/O of PNKCC who held the rank of Sergeant, whose last name is Keller, and whose first name is presently unknown to Plaintiff. As such, he was assigned to help oversee the operation of the Law Library / School building at the prison. He is sued in his individual capacity.

11. Defendant, Cheryl Bolling, was at all times mentioned herein the Head Law Librarian of PNKCC. As such, she was responsible, amongst other things, for scheduling inmates to receive law library access and issuing call-passes to the inmates which permit them to attend the scheduled law library research session(s). She is sued in her individual capacity.

12. Defendant, Dana Newton, was at all times mentioned herein the Assistant Law Librarian of PNKCC. As such, she was responsible, amongst other things, for scheduling inmates to receive law library access and issuing call-passes to the inmates which permit them to attend the scheduled law-library research session(s). She is sued in her individual capacity.

13. Defendant, Shayne Mercier, was at all times mentioned herein a Grievance Officer of PNKCC who was responsible for resolving and/or responding to IDOC Grievances at the second-level of the grievance process via a "Grievance Officer's Report." She is sued in her individual capacity.

14. Defendant, Amy Burle, was at all times mentioned herein a Member of the Administrative Review Board ("ARB") for the Illinois Department of Corrections ("IDOC"), located at: 1301 Concordia Court, Springfield, IL 62794-9277. As such, she was responsible for responding to Grievances that were appealed to the Director of IDOC. She is sued in her individual capacity.

15. Defendant, Lt. Frank (i.e., Lieutenant Frank), was at all times mentioned herein a C/O of PNKCC who held the rank of Lieutenant, whose last name was Frank, and whose first name is presently unknown to Plaintiff. As such, he was responsible for supervising the Internal Affairs department of the prison. He is sued in his individual capacity.

16. Defendant, Scott Thompson, was at all times mentioned herein the Warden and Chief Administrative Officer of PNKCC. As such, he was responsible for promulgating the rules, regulations, and policies to be followed by all employees of PNKCC, and he also had the authority to discipline said employees for violation(s) of those rules, regulations, and policies. He is sued in his individual and official capacities.

17. Defendant, Rob Jeffreys, was at all times mentioned herein the Director of IDOC. As such, he was legally responsible for the overall operation of the department and each institution/facility under its jurisdiction, including PNKCC. He was also responsible for the final determination and adjudication of grievances that were appealed to him. He is sued in his individual and official capacities.

## IV. PREVIOUS LAWSUITS

18. Plaintiff previously filed a lawsuit in this court, entitled "McIntosh v. Watson, et al." (Case No. 3:15-cv-01016), which was settled and dismissed in 2018.

19. In or about September of 2016, Plaintiff filed a lawsuit in this court, entitled "McIntosh v. Kelly, et al." (Case No. 3:16-cv-01018), which is still pending before the court.

20. In or about January of 2017, Plaintiff filed a lawsuit in this court, entitled "McIntosh v. Wexford Health Sources, Inc., et al." (Case No. 3:17-cv-00103), which is currently pending before this court.

21. In or about January of 2017, Plaintiff filed a lawsuit in the Circuit Court of St. Clair County, Illinois for the Twentieth Judicial Circuit, entitled "McIntosh v. Rosenblum, et al." (Case No. 17-AR-58), which is currently pending on appeal before the Illinois Appellate Court for the Fifth Judicial District.

22. In or about November of 2020, Plaintiff filed a lawsuit in the Circuit Court of St. Clair County, Illinois for the Twentieth Judicial Circuit, entitled "McIntosh et al. v. Fairview Heights Police Department, et al." (Case No. 20-L-0940), which is currently pending before the circuit court.

23. On June 3, 2021, Plaintiff filed a lawsuit in this court, entitled "McIntosh v. Thompson, et al." (Case No. 3:21-cv-00596), which is currently pending before this court.

24. Plaintiff has never had any civil action, whether federal or state, dismissed as be-

(5)

-ing frivolous, malicious, or as failing to state a claim upon which relief can be granted.

## V. FACTS

* **Count 1** – Fourteenth Amendment equal protection claim against Defendant Miller for refusing to sell Plaintiff commissary items based on racial animus.

25. On June 27, 2019, at approximately 9:13 a.m., Plaintiff was in the Commissary building ("Commissary") of Pinckneyville Correctional Center ("PNKCC") and having his commissary order form (which contained an itemized list of goods that he wished to purchase) processed at Window #1 by Defendant Supply Supervisor ("S/S") Miller.

26. After scanning Plaintiff's Inmate I.D. card and selling him some items from his order form, Defendant Miller suddenly closed-out Plaintiff's transaction account and informed him of his remaining trust account balance as if he was finished shopping, although Miller had failed to sell Plaintiff about 10 items that had been clearly listed on his order form — all of which Plaintiff had the requisite and sufficient funds to purchase.

27. At that point, Plaintiff casually alerted Defendant Miller that he had skipped over the remainder of the unprocessed items on Plaintiff's order form, whereupon Miller suddenly became angry and muttered, "you motherfuckers", placing a noticeable emphasis on the word 'you'. Miller then appeared momentarily flustered as Plaintiff calmly pointed out each of the items which Miller had missed.

28. After examining Plaintiff's order form and barking at him that the commissary did

(6)

not have any "fucking shit paper" (which was a crude reference to the toilet paper listed on the order form), Defendant Miller printed out a receipt for the items which he had initially sold Plaintiff and then opened a 'new' transaction account to which he added Plaintiff's purchase of 5 MP3 song-units (i.e., one of the items that had originally been skipped).

29. Defendant Miller then instructed an inmate-worker of the commissary to retrieve a bag of chips listed on Plaintiff's order form and to place it onto the counter in front of Plaintiff. However, as Plaintiff reached out to grab the bag of chips and place it into his laundry bag (as is customarily done by all inmates with respect to all items placed onto the counter for purchase, and as Plaintiff had repeatedly done with respect to all other items that Miller had sold him on that occasion), Miller, a white man, snapped at Plaintiff, a black adult male, "put the damn chips back on the counter, boy... I didn't tell you to grab shit."

30. Plaintiff placed the bag of chips back onto the counter and but told Miller not to call Plaintiff "boy" as it was clearly a racially-derogatory term. Plaintiff further told Miller that there was no need for him to speak to Plaintiff in that manner because he just wanted to buy his commissary items and did not want to argue with Miller.

31. At that point, Defendant Miller —who was in the process of scanning the bag of chips as Plaintiff spoke— suddenly stopped what he was doing and said, "You know what?". Miller then closed Plaintiff's transaction account again without selling Plaintiff any of the remaining outstanding items on his order list, had Plaintiff sign and fingerprint both of the receipts (from both transactions), and yelled at Plaintiff to "get the fuck out, boy!", placing an intentional and snarling emphasis on the racial slur of "boy" in a clear message to Plaintiff.

(7)

32. Defendant Miller further warned Plaintiff that if he even thought about "making any waves" (i.e., reporting or making a complaint against) about what had just transpired, he would be "dealt with" (i.e., retaliated against).

33. This was not the first (nor even the second) time that Defendant Miller had arbitrarily denied Plaintiff the purchase of items that had been clearly listed on his order form. Moreover, Plaintiff had personally witnessed other black and Hispanic inmates of PNKCC suffer such denials by Miller on countless occasions despite those inmates possessing the necessary funds to purchase the items.

34. Indeed, upon information and belief, throughout his entire time working and processing orders at commissary (i.e., both before and after the encounter with Plaintiff on 6/27/2019), Defendant Miller engaged in such an improper denial of commissary items to inmates of PNKCC — who were disproportionately Black and/or Hispanic with respect to the racial make-up of the inmate population at PNKCC — on approximately 50 (or more) occasions, whereupon he either previously or subsequently sold the very same in-stock item(s) to white inmates, thereby ensuring that white inmates received a 'privileged' access to some of the more choice items (or any particular item) before such item(s) ran out-of-stock.

35. Furthermore, at the time during which Defendant Miller wrongfully and intentionally denied Plaintiff commissary items on 6/27/2019, Plaintiff was on 'A'-grade privilege status, was not on any sort of disciplinary commissary restriction, and had complied with all proper protocols and procedures so as to be permitted to purchase all of the commissary items which he had written on his order list. There was no legitimate reason why he should have been denied any in-stock item which was listed on his order form. Plaintiff suffered great humiliation, shame, anger, embarrassment, fear, anxiety, depression, and emotional distress from Miller's racist actions.

(8)

36. Yet, given Defendant Miller's repeated denial of commissary items to Plaintiff prior to 6/27/2019, Miller's particular denial of commissary items to Plaintiff on 6/27/2019 when Miller repeatedly called Plaintiff a racial slur which Miller emphasized, and Miller's history of arbitrarily and disproportionately denying the purchase of in-stock items by Black and Hispanic inmates, it is clear that his denial of commissary items to Plaintiff both before and on 6/27/2019 was motivated by and rooted in racial animus.

37. Accordingly, Defendant Miller is liable for racially discriminating against Plaintiff regarding the purchase of commissary items, in clear violation of Plaintiff's right to equal protection secured by the Fourteenth Amendment to the U.S. Constitution.

\* Count 2 – Fourteenth Amendment due process claim against Defendant Miller for arbitrarily and unfairly restricting Plaintiff's purchase of, and/or access to, commissary items without giving Plaintiff either notice of a disciplinary violation or a disciplinary hearing.

38. Plaintiff hereby realleges and incorporates by reference paragraphs #1-37 as set forth above, as if fully set forth herein.

39. Pursuant to the policies of both IDOC and/or PNKCC, the otherwise proper and permitted purchase of commissary items and/or the opportunity to purchase commissary items can only be restricted (with regard to the amount of money which can be spent by an inmate during any one shop) or prohibited (in terms of how many times an inmate can shop at commissary during a given period of time) as a disciplinary measure to be imposed upon an inmate after he receives both (1) a disciplinary ticket (i.e., notice)

(9)

alleging that he committed a particular disciplinary infraction and (2) a disciplinary hearing at which he is given an opportunity to be heard before being found guilty of the infraction.

40. However, at the time when Defendant Miller restricted and/or impeded Plaintiff's attempted purchase of the commissary items that remained outstanding on his order list, i.e., on 6/27/2019, Plaintiff had neither been accused of committing a disciplinary infraction, issued a disciplinary ticket for such a violation, nor provided with an opportunity to be heard in a disciplinary hearing, nor found guilty pursuant thereto.

41. Moreover, on 6/27/2019, at the time that Defendant Miller restricted and stopped Plaintiff's purchase of the aforesaid items, Miller was particularly aware of the proper policy and mechanism by which a prisoner could be officially restricted and/or prohibited in the purchasing of commissary, because such restrictions and/or prohibitions, as to each inmate, were noted in the computer which Miller used processing commissary orders and which alerted him of the shopping-status of each inmate he dealt with.

42. Yet, Defendant Miller's denial of the commissary items to Plaintiff on 6/27/2019 intentionally, maliciously, and effectively served to impose upon Plaintiff the same sort of disciplinary punishment which was supposed to be reserved for only those inmates who had been found guilty of a disciplinary violation after being given such aforementioned notice and hearing, despite the fact that Plaintiff—as Miller knew—had not been provided either. Thus, Plaintiff received none of the process due to him beforehand.

43. Accordingly, Defendant Miller is liable for arbitrarily and unfairly restricting Plaintiff's purchase of the outstanding commissary items where Plaintiff was not afforded the requisite notice of a disciplinary infraction, provided an opportunity to be heard in a disciplinary hearing, nor found guilty of any disciplinary violation that

(10)

warranted such restriction — all in clear violation of Plaintiff's right to due process secured by the Fourteenth Amendment to the U.S. Constitution.

✱ Count 3 — First Amendment retaliation claim against Defendant Miller for prohibiting Plaintiff's purchase of commissary items in retaliation for Plaintiff making a verbal complaint to a superior officer about Miller's previous race-based discrimination and commissary restrictions.

44. Plaintiff hereby realleges and incorporates by reference paragraphs #1-43 as set forth above, as if fully set forth herein.

45. Upon exiting the commissary building and arriving back at his housing unit (i.e., R1-B) at approximately 9:20 a.m., Plaintiff immediately reported to his assigned wing officer, Defendant C/O Crouse, what had occurred at commissary with Defendant Miller and further stated his need to purchase the remainder of the outstanding items on his order list. Crouse responded that Plaintiff could speak with Defendant Lt. Webb about the problem once Webb — who was not on location at that moment — returned to the cellhouse.

46. In the meantime, at approximately 10:07 a.m., Plaintiff was walking to the dining hall of PNKCC for lunch, along with the rest of his housing unit, when he saw Major Lively walking toward the commissary building and asked to speak with him. After receiving Major Lively's permission to step out of the lunch line and speak with him, Plaintiff reported to Major Lively the entire situation and encounter with Defendant Miller, whereupon Lively responded that he had already received "about 20" complaints that same day (6/27/2019) regarding such conduct by Miller in the commissary and was in fact headed into the commissary building to speak with Miller

(11)

about these complaints at that very moment.

47. Plaintiff then went into the dining hall for lunch. Yet, at approximately 10:17 a.m., as Plaintiff was leaving from the dining hall and returning to his cell, he saw Defendant Miller leaving from the commissary building and walking toward the Personal Property building. Miller visibly appeared to be even more angrier than before, red-faced and muttering to himself.

48. At approximately 12:35 p.m., the "last call for commissary" was announced over the P.A. speaker in Plaintiff's living unit, whereby all inmates who had not previously shopped at the commissary could go do so.

49. At that moment, Plaintiff exited his cell (R1-B-#71) and went to the officer's care of the cellhouse whereupon he spoke with Defendant Sgt. Monroe about what occurred with Defendant Miller earlier in the day and how Plaintiff had been wrongfully prevented from purchasing all of the items on his order list, requesting to be permitted to return to commissary in order to buy the outstanding items. Monroe, in turn, went into Defendant Lt. Webb's office and spoke with him about allowing Plaintiff to return to commissary to get the rest of his items; Plaintiff was then granted such permission by Defendant Monroe who then radioed ahead to inform the escorting officer that Plaintiff was walking over to commissary.

50. Upon his arrival back at commissary, Plaintiff saw that there was a different Commissary Officer at Window #1; yet after Plaintiff explained to him why Plaintiff had come back to commissary for a second time, the officer forced Plaintiff to go to Window #4, where the officer knew that Defendant Miller was then working, by refusing to process Plaintiff's order at Window #1 and directing him to Window #4.

(12)

51. At approximately 12:45 p.m., Plaintiff approached Window #4 and gave Defendant Miller the carbon-copy of his original commissary order form (because the original was retained by the commissary personnel during Plaintiff's initial attempt to shop), whereupon — in the course of explaining to Miller why Plaintiff was presenting him with a carbon-copy of the form — Plaintiff had to remind Miller of both who Plaintiff was and why he had returned to purchase the remainder of the outstanding items on the form. In particular, Plaintiff had to explain that he had returned with Defendant Webb's permission.

52. Defendant Miller immediately responded by asking Plaintiff he were the one who had complained about Miller to Major Lively (who, in turn, had apparently confronted Miller about the complaint); whereupon, after Plaintiff admitted that he had indeed spoken to Major Lively regarding the earlier confrontation with Miller, Miller told Plaintiff, "I warned you about starting shit. Fuck Webb. I've got something for you... now, beat it!"

53. Thus, Defendant Miller again refused to sell Plaintiff the remainder of the outstanding items on his commissary order form — this time in clear retaliation for Plaintiff's exercision of his First Amendment right to free and protected speech in making a verbal complaint against Miller to Major Lively.

54. For prisoners such as Plaintiff, the access to commissary is pertinent and indispensable to obtaining everything to meet their needs, including but not limited to: (1) Basic hygiene items (e.g., soap, toothpaste, toothbrushes, shampoo, deodorant, dental floss, combs, laundry detergent, etc.); (2) Clothing and bedding items (e.g., boxers/briefs, socks, t-shirts, shoes, bath towels, wash cloths, sheets, blankets, pillows, etc.); (3) Stationary items required to attend to legal affairs and to write loved ones (e.g., legal pads, notebook/typing paper, mailing envelopes, ink pens, etc.); and (4) Debit-account phone minutes and messaging vouchers needed to both

(13)

make phone calls to family and friends who lack the means to pay to accept prisoner-calls from their end and send E-mail messages to family and friends. Without these essential items, prisoners cannot meet their basic needs nor attend to legal matters affecting their rights and/or freedom.

55. Thus, Defendant Miller's actions of retaliatorily denying Plaintiff in the purchase of the outstanding commissary items were clearly meant to 'chill' Plaintiff, and any like prisoner of ordinary firmness, in the exercise of such free and protected speech, and indeed were sufficient to do so because the de facto denial of commissary to a prisoner thereby amounts to a de facto denial of (1) basic hygiene items, (2) clothing and bedding items, (3) stationary items needed to access the court and/or otherwise communicate with the outside world, and (4) the denial of phone and e-mail capability.

56. Accordingly, Defendant Miller is liable for denying and/or prohibiting Plaintiff's purchase of commissary items in retaliation for Plaintiff's exercise of free and protected speech in making a verbal complaint against Miller, in violation of the First Amendment to the U.S. Constitution.

\* Count 4 - Fourteenth Amendment equal protection claim against Defendant Thompson for creating, maintaining, and/or condoning an unwritten policy, practice, or custom of discriminatory refusals to sell commissary items to prisoners based on racial animus.

57. Plaintiff hereby realleges and incorporates by reference paragraphs #1-56 as set forth above, as if fully set forth herein.

58. Upon information and belief, Defendant Miller worked in the commissary, selling items to PNKCC-inmates from each housing unit of the prison, from about the beginning

(14)

of 2018 to at least through the beginning of 2020, notwithstanding any temporary leave of absence that he may have taken from that position.

59. Furthermore, throughout that timeframe, in PNKCC, commissary was sold to inmates 5 days per week, approximately 8 hours per day.

60. During that period of time, Defendant Miller regularly engaged in the above-described practice of racially discriminating against Black and Hispanic inmates by refusing to sell them the in-stock items listed on their order forms which he would then subsequently sell to white inmates.

61. Thus, Defendant Miller's misconduct was clearly persistent, widespread (where it occurred with respect to black/brown inmates of every housing unit in PNKCC, which housed approx. 2,000 prisoners), longstanding, and routine — thereby constituting a custom of PNKCC which had the effect of a policy.

62. Moreover, Defendant Miller's misconduct throughout that time resulted in a barrage of verbal complaints by victimized inmates to nearly every ranking Sergeant, Lieutenant, and Major employed as a C/O by PNKCC during that period, as well as multiple written grievances that were ultimately reviewed by the Warden of PNKCC, Defendant Thompson.

63. Therefore, Defendant Thompson — except for his deliberate indifference thereto — either should have known of, would have known of, or, in fact, did know of Defendant Miller's routine practice of racial discrimination in the commissary. Nevertheless, Thompson allowed the practice to persist, thereby maintaining it and giving it the force of policy.

64. In fact, upon receiving Plaintiff's written grievance about the specific aforementioned instance of racial discrimination by Defendant Miller, Defendant Thompson intentionally ig-

-nored the obvious key facts of the grievance which, if subjected to the most minimal of investigation, would have irrefutably shown that Miller had both intentionally prohibited Plaintiff's purchase of commissary twice on 6/27/2019 and thereafter lied in his subsequent response to Plaintiff's grievance by falsely claiming that Plaintiff had simply tried "to shop twice in one day" and that it was "[T]he computer" which prohibited him. Yet, Thompson knew Miller's response was a lie but still accepted it in order to condone and turn a blind-eye to Miller's actions, thereby ratifying Miller's misconduct and making it a sanctioned and unwritten policy.

65. Upon information and belief, Defendant Thompson had previously condoned and/or turned a blind-eye to such misconduct by Defendant Miller, which, in turn, was the primary 'moving force' that directly caused Miller to racially discriminate against Plaintiff on 6/27/2019.

66. Accordingly, Defendant Thompson is liable for creating, maintaining, and/or condoning an unwritten policy, practice, or custom of racially discriminatory refusals to sell commissary items to prisoners based on racial animus.

## VI. EXHAUSTION OF ADMINISTRATIVE REMEDIES

67. Pursuant to IDOC Grievance #2006-07-01, Plaintiff has exhausted his administrative remedies with respect to all claims and all defendants.

## VII. LEGAL CLAIMS

68. Plaintiff hereby realleges and incorporates by reference paragraphs #1-67 as set forth above, as if fully set forth herein.

(16)

69. Plaintiff wishes to sue each of the relevant defendants for each of the relevant legal claims as set forth above.

70. Plaintiff has no plain, adequate, or complete remedy at law to redress the wrongs described herein. Plaintiff has been and will continue to be irreparably injured by the conduct of the defendants unless this court grants the declaratory and monetary relief which Plaintiff seeks.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this court enter judgment granting Plaintiff:

71. A declaration that the acts and omissions described herein violated Plaintiff's rights under the Constitution and laws of the United States.

72. Compensatory damages in the amount of $35,000.00 against each defendant, jointly and ~~separately~~ severally.

73. Punitive damages in the amount of $40,000.00 against each defendant, jointly and severally.

74. A jury trial on all issues triable by jury.

75. Plaintiff's costs in this suit.

76. Any additional relief this court deems just, proper, and equitable.

(17)

Dated: July 21, 2021

Respectfully submitted,

/s/ Dallas McIntosh

Dallas McIntosh, #B85114
Lawrence Correctional Center
10930 Lawrence Road
Sumner, IL 62466

## VERIFICATION

I have read the foregoing complaint and hereby verify that the matters alleged therein are true, except as to matters alleged on information and belief, and, as to those, I believe them to be true. I certify under penalty of perjury that the foregoing is true and correct.

Executed at Lawrence Correctional Center in Sumner, Illinois on July 21, 2021.

/s/ Dallas McIntosh
Dallas McIntosh, #B85114

(18)

## PROOF/CERTIFICATE OF SERVICE

I, the undersigned, hereby certify and declare that on July 22, 2021, I placed the foregoing document (i.e., "Civil Rights Complaint") into the institutional mail system at Lawrence Correctional Center, in a manila envelope properly marked and addressed to the "Law Library", to be forwarded to the prison's Law Library and electronic- -ally filed using the CM/ECF system, which, in turn, will cause the document to be electronically filed with the Clerk of the Court for the United States District Court for the Southern District of Illinois.

Pursuant to 28 U.S.C. Section 1746, the undersigned hereby certifies and de- -clares that the statements set forth above are true and correct.

/s/ Dallas McIntosh
Dallas McIntosh, #B85114